# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| TAMARA BROYLES, | : | |
| Plaintiff, | : | |
| | | Case No. 3:11cv00179 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.  Introduction

Plaintiff Tamara Broyles brings this case challenging the Social Security Administration's denial of her applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).  This Court has jurisdiction to review the administrative denial of her applications.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11),  the administrative record (Doc. #6), and the record as a whole.

Plaintiff asserted in administrative proceedings that she is eligible to receive DIB and SSI because she is under a "disability" within the meaning of the Social Security Act. In the present case, she seeks a reversal of the ALJ's decision and a remand of this case to

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

the Social Security Administration for payment of benefits. The Commissioner contends that an Order affirming the ALJ's decision is warranted.

## II.    Background

### A.    Procedural History

Plaintiff filed her SSI and DIB applications in lat June 2007, asserting that she has been under a disability since May 14, 2005. (Doc. #6, PageID at 168-72, 173-80). She asserted that her disability consisted of a combination of physical and mental impairments – specifically, ["b]i polar condition, arm and neck pain, extreme allergies, hives, high blood pressure, circulation problems (Reynaud's Disease) in hands, legs, and feet." (Doc. #6, PageID at 197).

Following initial administrative denials of her applications, Plaintiff received a hearing before Administrative Law Judge (ALJ) John L. Mondi. ALJ Mondi later issued the written decision concluding that Plaintiff was not under a disability and not eligible to receive DIB or SSI. (Doc. #6, PageID at 49-57).

### B.    Plaintiff's Vocational Profile and Testimony

Social Security Regulations recognize that a person's ability to obtain and perform a paid job depends – in part – upon his or her age, educational background, and skills or training. *See* 20 C.F.R. §§404.1520(a)(4), 404.1560 – 404.1568. Plaintiff was 56 years old on the date the ALJ issued his decision. This placed her in the category of a "person of

advanced age." 20 C.F.R. §§404.1563; 416.963.[2]  She has a high school education and has

worked in the past as an injection molding machine operator and a waitress.  She has also

audited parts at an automobile parts manufacturing company.

 Plaintiff testified at the administrative hearing that she had been working for

approximately four months (since December 2008) at a nursing home cleaning dishes.  She

worked an average of fourteen hours per week.  She was also trying to learn to serve

residents as well but was having difficulty with her memory and with keeping up with

work tasks.  (Doc. #6, PageID at 68).  Her previous job at a plastics factory ended in May

2005.  She explained, "The said I was drunk and took me to urgent care.  They did find

some marijuana but I do believe the whole problem started earlier that week when I tried to

go back on Effexor for the first time in four years and they thought I was on drugs, serious

drugs." *Id.*

 When asked what would prevent her from working full time, Plaintiff testified, "My

right arm and hip mostly and the anxiety that I get when I'm trying to learn something new

and the mistakes that I made or that I keep making when I'm nervous."  (Doc. #6, PageID

at 69-70).  She acknowledged that she had a past history of substance abuse and had last

used marijuana and alcohol 11 months before the hearing.  At the time of the hearing, her

medications included Lisinopril for blood pressure and Atarax for hives and anxiety.  She

had a history of failure at her jobs because of mood swings which made her unpopular with

management.

---

 [2]  The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI Regulations.

Plaintiff testified that her right hip limited her to three hours of standing and three hours of walking at a time.  She was not sure if she could lift 15 or 20 pounds.  She noted, "I've been dropping things.  It's one of the reasons I'm scared I'm going to lose this [nursing home] job.  I've been giving out and I've been dropping clean dishes and glasses and stuff."  (Doc. #6, PageID at 70).

Plaintiff lived in an apartment had difficulty caring for herself.  She testified, "I'm having trouble.  There are very old, steep concrete steps outside and this winter I've had a lot of trouble with ice and I can't really shovel and go on to work and then I had trouble with my car getting stuck if I tried to park in the back because the snow and mud and there's plumbing problems that are causing me to feel terrible because I'm allergic to so many things."  (Doc. #t6, PageID at 71-72).  In her spare time, Plaintiff watched television, listened to the radio, and sometimes talked on the phone or read.  She visited her mother, who lived nearby, every four to six weeks.

When she was asked whether working at the nursing home had improved her symptoms, Plaintiff described having memory problems, running late, and losing periods of time.  *Id.*

### C. <u>Medical Opinions</u>[3]

#### <u>Arvin Nanda, D.O.</u>

---

[3] Plaintiff's Statement of Errors focuses primarily on her mental impairments and limitations. Accordingly, the Court will focus its review of the medical opinions about Plaintiff's mental impairments and limitations.

Plaintiff began seeing her Dr. Nanda, a primary care physician, in January 2007. (Doc. #6, PageID at 330). Dr. Nanda diagnosed Plaintiff with hypertension, non-compliance with medications, alcoholism, and nicotine dependence. *Id*.

In July 2007, Dr. Nanda noted that Plaintiff was experiencing symptoms of depression and was having difficulty dealing with other people. She reported to Dr. Nanda that she was bipolar but that she "need[ed] no meds currently." *Id*., PageID at 331. Dr. Nanda completed an "Ability to Work" questionnaire in which he noted that Plaintiff's diagnoses included hypertension and bipolar disorder. *Id*., PageID at 332. Dr. Nanda opined that Plaintiff had the functional ability to stand/walk up to 6 hours in an 8 hour work day and sit up to 4 hours in an 8 hour work day. Dr. Nanda also opined that Plaintiff would be unable to use her hands for repetitive simple grasping, pushing, pulling, and fine manipulation. He further opined that Plaintiff would be limited to only occasional bending, squatting, and crawling. Dr. Nanda concluded that Plaintiff was capable of performing part-time work. *Id.*

Dr. Nanda also completed a "Mental Functional Capacity Assessment." (Doc. #6, PageID at 336-37). Dr. Nanda opined that Plaintiff would be moderately limited in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination or close proximity with others without being distracted by them, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation. *Id.* Dr. Nanda opined that Plaintiff was markedly limited in several work areas – namely, her ability to interact with the

5

general public, to accept instructions, to respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* When explaining his opinions, Dr. Nanda noted, "No observation or evidence used. Direct questioning of patient used." (Doc. #6, PageID at 337). Dr. Nanda also checked two boxes: one indicating his opinion that Plaintiff was employable; the other indicating that her functional limitations would last 12 months or more. *Id*.

### Craig D. Olson, Psy.D.

On September 12, 2007, Craig D. Olson, Psy.D., examined Plaintiff on behalf of the Ohio Bureau of Disability Determination (Ohio BDD). (Doc. #6, PageID at 353-59). Plaintiff reported that she had been arrested in 1999 for driving under the influence. Her last job "was working in 2003 for two years as a press operator at a factory until [she noted] 'I hadn't been taking Effexor for six years,' I hadn't had week.' She related ' they spayed poison on me,' and 'they found weed on me.'" (Doc. #6, PageID at 354).

As to her medical history, Plaintiff informed Dr. Olson that she was not taking any psychotropic medications. She had never been hospitalized for mental health reasons, other than outpatient alcohol and drug rehabilitation in 2000 upon a court order. She reported that she drank eight beers a night, had used "acid" and cocaine in the past, and used about a quarter ounce of marijuana a week. Dr. Olson's report further states, "She now uses marijuana 'daily, if I have it.'" (Doc. #6, PageID at 355).

Plaintiff's household-management activities included cooking, shopping, and laundry; her boyfriend handled the finances. She socialized with some friends, read the

6

newspaper, and sewed.  During a typical day Plaintiff would get up, drink coffee, watch television, go grocery shopping (sometimes), do household task and go walking (sometimes).

During the mental status examination, Plaintiff was cooperative but could become slightly irritable or agitated at times.  Her speech volume was greatly increased, her conversation was logical at times but she rambled often.  Her affect was very labile; her mood seemed hypomanic to manic.  She reported a variety of depressive symptoms including sleep problems, crying spells, suicidal thoughts, and a suicidal gesture.  She also reported suffering from persistent worry and fear, anxiety attacks, a racing heart, difficulty breathing, and vision distortion.  During the clinical interview, she exhibited autonomic signs of anxiety including sweating, motor restlessness and excessive talking.  She also demonstrated a flight of ideas.

Dr. Olson observed that Plaintiff was oriented to person, place, time, and situation. He found that Plaintiff's concentration and attentional skills were fair; she was able to complete two of three mental control tasks; her memory skills seemed to be reasonably intact; and her level of abstract reasoning appeared to be average to possibly above average.  (Doc. #6, PageID at 356-57).

Dr. Olson diagnosed Plaintiff with bipolar disorder, cannabis abuse, alcohol abuse, and a personality disorder with narcissistic and borderline features.  (Doc. #6, PageID at 357-58).  He believed that Plaintiff's Global Assessment of Functioning (GAF) was 40 and

that her highest GAF score of the past year had been 48.[4]  (Doc. #6, PageID at 358).  A

GAF of 41-50 indicates that a person has "severe symptoms ... or  serious impairment in

social, occupational, or school functioning (e.g., no friends, unable to keep a job). . . ."

*See* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at 34.

      Dr. Olson opined that Plaintiff's mental ability to relate to others is severely

impaired by her mood disorder and that she would have difficulty relating sufficiently and

consistently with coworkers and supervisors in any competitive job environment.  He also

opined that Plaintiff's ability to understand, remember, and follow instructions is

moderately impaired, at least.  He found that Plaintiff was severely impaired in her abilities

to maintain attention, concentration, persistence, and pace to perform simple, repetitive

tasks and her ability to withstand the stress and pressures associated with day-to-day work

activity.  Dr. Olson concluded that Plaintiff does not have the mental ability to perform

even simple, repetitive work tasks in day-to-day competitive job employment.  (Doc. #6,

PageID at 358-59).

## Alice Chambly, Psy.D.

      On November 5, 2007, Dr. Chambly reviewed the record at the request of the Ohio

BDD.  (Doc. #6, PageID 369-83).  According to Dr. Chambly, Plaintiff experienced

moderate limitations in the following functional areas: understanding, remembering, and

---

    [4]  Evaluation of GAF considers the patient's psychological, social, and occupational functioning
on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall
psychological functioning" at or near the time of the evaluation.  *See Hash v. Commissioner of Social
Sec.*, 309 Fed.Appx. 981, 988 n.1 (6th Cir. 2009); *see also* Diagnostic and Statistical Manual of Mental
Disorders, 4th ed., Text Revision at 32-34.

carrying out  detailed instructions; performing activities within a schedule; maintaining regular attendance; being punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; to performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting.  (Doc. #6, PageID at 369-370).  Dr. Chambly concluded that Plaintiff was not markedly limited in any area of work ability.

Dr. Chambly explained, in part, "Weight given to CE examiner's [Dr. Olson's] opi[ni]ons as these are the only psych records in file.  Examiner opines severe limitations in C/P/P [Concentration/Persistence/Pace], although Clt is able to care for ADL [Activities of Daily Living] independently. . . .  The totality of the MER does not support marked limitations due to Clt's level of functioning.  Her symptoms are likely to improve with continued sobriety."  (Doc. #6, PageID at 371).  Dr. Chambly concluded that Plaintiff would be capable of simple to moderately complex tasks in a routine work setting and that she would do best in situations with limited contact with the general public.  *Id.*

Todd Finnerty, Psy.D., reviewed the record on March 3, 2008 and affirmed Dr. Chambly's assessment without providing any meaningful analysis.  (Doc. #6, PageID at 397).

III.    **Administrative Review**

## A.  "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  A "disability" consists of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

## B.  Social Security Regulations

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence; *See PageID* 49-51; *see also* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?

2.    Does the claimant suffer from one or more severe impairments?

3.    Do the claimant's severe impairments, alone or in combination, meet or equal

the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?  The claimant's residual functional capacity is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.[5]

5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

C.    **ALJ Mondi's Decision**

At Step 1 of the sequential evaluation, ALJ Mondi found that Plaintiff has not engaged in substantial gainful activity since May 14, 2005, the alleged onset date.  (Doc. #6, PageID at 52).

The ALJ found at Step 2 that Plaintiff has the severe impairments of "Reynaud's syndrome, an affective disorder, anxiety, and a substance abuse disorder in early remission."  *Id.*  The ALJ also concluded that Plaintiff's hypertension and rashes are not considered severe impairments.  (Doc. #6, PageID at 52-53).  As to substance abuse, the ALJ noted, "The claimant has a history of heavy daily marijuana abuse and alcohol consumption, drinking six to eight beers every day until April 2009.  She had court-ordered substance abuse treatment in 2000, but she has rejected recent suggestions that she attend substance abuse treatment, even though doctors have advised her of the impact of

---

[5]  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

11

psychoactive substances on depression, anxiety, and hypertension." (Doc. #6, PageID at 52) (internal citations omitted).

At Step 3, the ALJ found that Plaintiff did not have a mental impairment or combination of impairments that met or equaled the criteria in Listing 12.04 (describing affective disorders), 12.06 (describing anxiety disorders), or 12.09 (describing substance-addiction disorders). (Doc. #6, PageID at 53).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity to perform medium exertional work, provided it does not require climbing ladders, ropes, and scaffolds; even moderate exposure to extreme cold; or more than moderately complex tasks. *Id.* The ALJ further concluded at Step 4 that Plaintiff was capable of performing her past relevant work as a hospital food service worker, an injection molding machine tender, and a waitress.

(Doc. #6, PageID at 53-56).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI.

## IV.    Judicial Review

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746; citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    Discussion

### A.    Plaintiff's Contentions

Plaintiff contends that the ALJ failed to accommodate her mental-functional

13

limitations when assessing her residual functional capacity.  The ALJ erred, according to

Plaintiff, by not providing a restriction for social, speed, or consistency.  Specifically,

Plaintiff argues that the ALJ failed to evaluate the opinions of her treating physician Dr.

Nanda, her consulting psychologist Dr. Olson, and state agency reviewer Dr. Chambly, as

required by the Regulations.

### B.    <u>Medical Source Opinions</u>

The treating physician rule, when applicable, requires an ALJ to place controlling

weight on a treating physician's or treating psychologist's opinion rather than favoring

the opinion of a nonexamining medical advisor or a one-time examining physician or

psychologist or a medical advisor who testified before the ALJ.  *Blakley,* 581 F.3d at 406;

*see Wilson*, 378 F.3d at 544.  A treating physician's opinion is given controlling weight

only if it is both well supported by medically acceptable data and if it is not inconsistent

with other substantial evidence of record.  *Blakley,* 581 F.3d at 406; *see Wilson*, 378 F.3d

at 544.

"If the ALJ does not accord controlling weight to a treating physician, the ALJ

must still determine how much weight is appropriate by considering a number of factors,

including the length of the treatment relationship and the frequency of the examination,

the nature and extent of the treatment relationship, supportability of the opinion,

consistency of the opinion with the record as a whole, and any specialization of the

treating physician."  *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is

given to the opinions of non-examining medical sources.  *See* 20 C.F.R.  §404.1527(d)(1).

14

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180 at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source.  *See id*. at *2-*3.  The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."  20 C.F.R. §404.1527(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. §404.1572(f); *see also* Ruling 96-6p at *2-*3.

### C.    <u>Analysis</u>

The ALJ began his discussion of Plaintiff's residual  functional capacity by stating, in part, that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs [Social Security Rulings] 96-2p, 96-5p, 96-6p and 06-03p."  (Doc. #6, PageID at 54).  The ALJ did not separately describe the legal criteria set forth in these Regulations and discussed in these Rulings.  The Court must therefore examine the ALJ's decision to determine whether he applied the correct legal criteria when evaluating the medical source opinions.  *See Bowen*, 478 F.3d at 746.

Recalling that the ALJ found Plaintiff's mental-work ability should not require more than moderately complex tasks, the ALJ based his assessment of Plaintiff's residual functional capacity on the opinion of the state agency reviewing psychologists.  He

explained:

> As for the opinion evidence, the residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services support a finding of "not disabled." Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision).

(Doc. #6, PageID at 55)(internal citation omitted). The ALJ correctly recognized that opinions provided by non-examining physicians do not generally deserve as much weight as the opinions of treating or examining physicians. *See* 20 C.F.R. 404.1527(d)(1). The ALJ's reasons why he did not apply this general rule thus become central to determining whether he applied the correct legal criteria.

The ALJ's parenthetical reference to reasons he "explained throughout this decision" does not illuminate any particular reason for crediting state-agency record-reviewing physicians over the opinions of Plaintiff's treating physician Dr. Nanda or examining physician Dr. Olson. Searching the ALJ's decision for his reasons reveals that he declined to credit Dr. Nanda and Dr. Olson and declined to credit Plaintiff's testimony about her limitations. As a result, the ALJ based his assessment of Plaintiff's work limitations on the state-agency reviewing physicians. The ALJ's decision, however, failed to show that he considered the opinions provided by state-agency physicians under any of the required regulatory factors. *See* Doc. #6, PageID at 53-56. This constituted a failure to apply the correct legal criteria because the Regulations and Rulings required the ALJ to weigh the opinions of record-reviewing physicians under the delineated regulatory factors,

16

including supportability, consistency, and specialization.  *See* 20 C.F.R. §404.1527(d), (f); *see also* Social Security Ruling 96-6p, 1996 WL 374180 .  The Regulations appear to emphasize this requirement by reiterating it no less than three times.  *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion...."); *see* also 20 C.F.R. §404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same).

In addition, the ALJ rejected the opinions of treating physician Dr. Nanda mainly based on the ALJ's disbelief of Plaintiff's reported symptoms.  The ALJ wrote, "The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.  Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's statements.  Notably, at this time the claimant's mental impairments were untreated, and she was using both alcohol and marijuana on a daily basis. . . ."  (Doc. #6, PageID at 56).  Although it may not have been error for the ALJ to consider Plaintiff's credibility as part of his evaluation of Dr. Nanda's opinions, the ALJ's brief evaluation failed to evaluate Dr. Nanda's opinion under the standards set by the treating physician rule or failed to continue weighing Dr. Nanda's opinions under the remaining regulatory factors.  Belaboring the point helps drive home its significance under the Regulations and case law:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment

17

relationship; the supportability and consistency of the physician's
conclusions; the specialization of the physician; and any other relevant
factors....  However, in all cases there remains a presumption, albeit a
rebuttable one, that the opinion of a treating physician is entitled to great
deference, its non-controlling status notwithstanding....

*Rogers*, 486 F.3d at 242 (citation omitted).  The Commissioner's Rulings likewise explain

the mandatory nature of the continued-weighing requirement, emphasizing:

> Adjudicators must remember that a finding that a treating source's
> medical opinion is not well-supported by medically acceptable clinical and
> laboratory techniques or is inconsistent with the other substantial evidence in
> the case record means only that the opinion is not entitled to 'controlling
> weight,' not that the opinion should be rejected.  Treating source opinions are
> still entitled to deference and must be weighed using all of the factors
> provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating
> source's medical opinion will be entitled to the greatest weight and should be
> adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p, 1996 WL 374188 at *4 (July 2, 1996)(emphasis added).

The ALJ's evaluation of one-time examining psychologist Dr. Olson was likewise

insufficient.  The ALJ wrote, "In September 2007 the consultative psychologist, Dr. Olson,

opined that the claimant had severe work-related limitations.  Again these opinions were

based upon her reported symptoms, reported mental health history, and her presentation at

the consultative evaluation at a time when she was not being treated by a mental health

professional, she was not taking psychotropic medications, and most importantly she was

using both alcohol and marijuana on a daily basis."  (Doc. #6, PageID at 56).  The ALJ

erred by emphasizing the verbal nature of the information that Dr. Olson gathered from

Plaintiff and by minimizing or ignoring the validity of such information in the evaluation

of mental work limitations.  As the United States Court of Appeals for the Sixth Circuit has

explained:

> In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices . . . in order to obtain objective clinical manifestations of mental illness. . . . [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987)(other citation omitted).

In addition, the ALJ essentially fails to explain why he adopted the "moderately complex task" restriction set by the state-agency reviewer, Dr. Chambly, over the many "marked" restrictions set by Drs. Nanda and Olson. The ALJ also did not explain why he failed to include any social or pace restrictions despite even Dr. Chambly's finding of moderate limitations in those areas. The Commissioner contends that even though the ALJ did not include such restrictions, it was at most harmless error because the vocational expert testified that a person with such limitations would be able to perform Plaintiff's past work as, for example, an injection molding machine tender. And, such testimony, was consistent with the ALJ's finding at Step 4 that Plaintiff could perform her past relevant work and was therefore not under a disability. This contention lacks merit. The vocational expert's testimony with regard to Dr. Chambly's questionnaire failed to extend beyond the limitation to no more than "moderately complex work." She testified, "[Plaintiff] would not be able to do the quality auditor work because that was skilled and this is – the MRFC [mental residual functional capacity] indicates that with restrictions she would have the ability to do simple to moderately complex work. So the quality auditor is beyond

moderately complex.  The other jobs however are all at unskilled so they would be okay."

(Doc. #6, PageID at 77).  Nothing in this testimony indicates that the vocational expert

considered a hypothetical person with a residual functional capacity for "moderately

complex work."  The vocational expert's testimony thus fails to demonstrate that the ALJ's

errors in evaluating the opinions provided by Drs. Nanda and Olson –  and thus his

incomplete assessment of Plaintiff's mental residual functional capacity – were harmless.

A review, moreover, of Dr. Nanda's opinions and Dr. Olson's detailed report does not

reveal that their opinions are "so patently deficient that the Commissioner could not

possibly credit" them.  *Wilson*, 378 F.3d at 547.  Consequently, the ALJ's errors were not

harmless.  *See Bowen*, 478 F3d at 747-48; *see also Wilson*, 378 F.3d at 546-47.

     Accordingly, Plaintiff's Statement of Errors is well taken.

## VI.   <u>Remand Is Warranted</u>

     Plaintiff seeks – and the Commissioner opposes – a judicial determination of

disability and a resulting remand for payment of DIB and SSI.

     If the ALJ failed to apply the correct legal standards or his factual conclusions are

not supported by substantial evidence, the Court must decide whether to remand the case

for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42

U.S.C. § 405(g), the Court has authority to affirm, modify or reverse the Commissioner's

decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501

U.S. 89, 99 (1991).  A remand for payment of benefits is warranted only "where proof of

the disability is overwhelming or where the proof of disability is strong and evidence to the

contrary is lacking." *Faucher*, 17 F.3d at 176.

The evidence of record does not overwhelmingly establish that Plaintiff was under a disability. The evidence of disability is also not strong with contrary evidence is lacking. Consequently, Plaintiff is not entitled to a judicial determination of disability and a remand for an award of benefits. *See Faucher*, 17 F.3d at 176. Yet a remand is warranted for further administrative proceedings due to the ALJ's errors, discussed previously. *See Faucher,* 17 F.3d at 176. On remand, the ALJ should be directed to (1) re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations and Rulings, and as required by case law; and (2) reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for DIB or SSI.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's decision be vacated;

2.    No finding be made as to whether Plaintiff Tamara Broyles was under a "disability" within the meaning of the Social Security Act;

3.    This case be remanded to the Social Security Administration under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.    The case be terminated on the docket of this Court.

May 21, 2012

                                    _____s/Sharon L. Ovington_____
                                          Sharon L. Ovington
                          United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).